**Slip Op. 04-133**

**United States Court of International Trade**

| |
|---|
| SIDERCA, S.A.I.C., |
| Plaintiff, |
| v. |
| UNITED STATES, |
| Defendant, |
| and |
| UNITED STATES STEEL CORP., |
| Defendant-Intervenor. |

Before: Pogue, Judge

Court No. 01-00603

[Plaintiff's motion for judgment on the agency record is denied. The Court sustains the International Trade Commission's sunset review determination in part, and remands in part.]

Decided: October 27, 2004

White & Case, LLP (David P. Houlihan, Gregory J. Spak, Richard J. Burke, Lyle B. Vander Schaaf, Joanna M. Ritcey-Donohue) for Plaintiff.

James M. Lyons, Acting General Counsel, Robin L. Turner, Acting Assistant General Counsel for Litigation, Peter L. Sultan, Attorney Advisor, United States International Trade Commission, for Defendant.

Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, James C. Hecht, Stephen P. Vaughn) for Defendant-Intervenor.

**OPINION**

**Pogue, Judge:** Plaintiff Siderca, S.A.I.C. ("Siderca")

challenges determinations made by Defendant, the U.S. International

Trade Commission ("the ITC") in the sunset review of antidumping

orders on certain standard, line, and pressure pipe ("SLP") from Argentina, Brazil, Germany, and Italy. Plaintiff, an Argentine producer of SLP, specifically challenges the ITC's cumulation of Argentine SLP with that of Brazil and Germany, and the ITC's finding that material injury to U.S. producers of SLP is likely to recur in the event of revocation of the antidumping orders. Plaintiff alleges that these determinations are not in accordance with law and unsupported by substantial evidence. Because the Court finds that the record does not disclose whether the ITC employed the correct legal standard in finding a likelihood of recurrence of material injury, the Court remands. In addition, for reasons of judicial economy, the Court also considers whether, given the correct legal standard, substantial evidence supports the ITC's determinations. While the Court finds that the ITC's cumulation decision is supported by substantial evidence on the record, the Court finds that the ITC's finding of a likelihood of recurrence of material injury is not so supported, and remands this determination for further consideration.

**BACKGROUND**

In August of 1995, pursuant to the ITC's finding that U.S. producers of SLP were being materially injured by competition from dumped imports, the United States Department of Commerce imposed antidumping orders on SLP from Argentina, Brazil, Germany, and

Italy.  See Certain Small Diameter Seamless Carbon and Alloy Steel Standard Line and Pressure Pipe from Argentina, 60 Fed. Reg. 39,708 (Dep't Commerce Aug. 3, 1995) (notice of antidumping duty order), Certain Small Diameter Seamless Carbon and Alloy Steel Standard Line and Pressure Pipe from Brazil, 60 Fed. Reg. 39,707 (Dep't Commerce Aug 3, 1995) (notice of antidumping duty order and amended final determination), Certain Small Diameter Seamless Carbon and Alloy Steel Standard Line and Pressure Pipe from Germany, 60 Fed. Reg. 39,704 (Dep't Commerce Aug. 3, 1995) (notice of antidumping duty order and amended final determination), Certain Small Diameter Seamless Carbon and Alloy Steel Standard Line and Pressure Pipe from Italy, 60 Fed. Reg. 39,705 (Dep't Commerce Aug. 3, 1995) (notice of antidumping duty order).  Five years later, pursuant to 19 U.S.C. § 1675(c) (2000), the ITC instituted a sunset review to determine whether revocation of the antidumping orders would likely lead to the recurrence of material injury to U.S. SLP producers within a reasonably foreseeable period of time.  See 19 U.S.C. § 1675a(a)(1)[1]; Seamless Pipe from Argentina, Brazil, Germany, and

_____

[1]Title 19 U.S.C. § 1675a(a)(1) states, in part:

(1) In general.
   In a [sunset review], the Commission shall determine whether revocation of an order, or termination of a suspended investigation, would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time.  The Commission shall consider the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked or the suspended investigation is terminated.

<u>Italy</u>, 65 Fed. Reg. 41,090 (ITC July 3, 2000) (institution of five-year reviews concerning the countervailing duty and antidumping duty orders on seamless pipe from Argentina, Brazil, Germany, and Italy).

In the course of the review, the ITC made two determinations which Plaintiff now challenges. First, pursuant to 19 U.S.C. § 1675a(a)(7), the ITC decided to assess the volume and effect of imported SLP from three of the four countries, including Argentina, cumulatively. <u>See</u> 19 U.S.C. § 1675a(a)(7)[2]; <u>Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Argentina, Brazil, Germany and Italy</u>, Investigations Nos. 701-TA-362 and 731-TA-707-710 (Review) (July 2001), Pl.'s Ex. 3 at 12-13 ("Commission's Views"); Pl.'s Initial Br.: Mem. of P. & A. in Supp. of Pl.'s Mot. for J. on the Agency R. at 13, 20 ("Pl.'s Br.").

---

19 U.S.C. § 1675a(a)(1).

[2]Title 19 U.S.C. § 1675a(a)(7) states:

<u>(7) Cumulation</u>
   For purposes of this subsection, the Commission may cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which [sunset reviews] were initiated on the same day, if such imports would be likely to compete with each other and with domestic like products in the United States market. The Commission shall not cumulatively assess the volume and effects of imports of the subject merchandise in a case in which it determines that such imports are likely to have no discernible adverse impact on the domestic industry.

19 U.S.C. § 1675a(a)(7).

Second, having cumulated the volume and effect of imported SLP from three of the four reviewed countries, the ITC found that these cumulated imports would likely cause recurrence of material injury to U.S. SLP producers within a reasonably foreseeable time.  See Commission's Views, CR List 2, Doc. 78 at 30; Pl.'s Br. at 13, 22.

## STANDARD OF REVIEW

The Court reviews the ITC's determinations in sunset reviews to ascertain whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); see also 19 U.S.C. § 1516a(a)(2)(B)(iii).

## DISCUSSION

Plaintiff challenges both the ITC's cumulation determination and its findings of a likely continuation or recurrence of material injury as not in accordance with law, and unsupported by substantial evidence.  The Court will first address the question of whether the two determinations were made in accordance with law, and then discuss the question of substantial evidence.

A.  It is Unclear on the Record Whether the ITC's Determinations Were Made in Accordance with Law

Plaintiff challenges both the ITC's cumulation determination and its material injury determination as not in accordance with law, in that the ITC did not make its determinations using the

statutorily required standard of likelihood. See Pl.'s Br. at 8. Most of the analysis that the ITC is statutorily required to undertake in a sunset review is governed by a "likely" standard. For example, in making a determination to cumulate the volume and effect of imports, the ITC is required to determine whether such imports are "likely" to compete with each other and with the domestic product. See 19 U.S.C. § 1675a(a)(7). Likewise, the ITC must determine whether material injury is "likely" to continue or recur. See 19 U.S.C. § 1675a(a)(1).

The common meaning of "likely" is "probable," or, to put it another way, "more likely than not." See, e.g., A.G. der Dillinger Huttenwerke v. United States, slip-op. 02-107, at 18, 18 n.14 (CIT Sept. 5, 2002) (explaining that in a countervailing duty sunset review, to satisfy a "likely" standard, a thing must be shown to be "probable," or "more likely than not"); Usinor Industeel, S.A. v United States, slip-op. 02-39, at 13-14 (CIT April 29, 2002) ("Usinor I"). In A.G. der Dillinger Huttenwerke and Usinor I, the ITC argued for or used a different definition of likely: one that meant something more akin to "possible" than "probable." The Court in those cases refused to countenance the argument that the meaning of the statutory word "likely" was ambigous, and upheld the "probable" standard. Id., see also Usinor Industeel, S.A. v. United States, 26 CIT __, __ 215 F. Supp. 2d 1356, 1357-1358 (2002) ("Usinor II") (denying interlocutory appeal

on the issue of the definition of "likely"), <u>Usinor Industeel, S.A.</u>

<u>v. United States</u>, slip op. 02-152, at 4-6 (CIT Dec. 20, 2002)

("<u>Usinor III</u>") (rejecting argument that "likely" means something

between "possible" and "probable"). While the ITC does not appear

to argue before the Court here that "likely" as used in sunset

reviews has any other meaning than "probable,"[3] Plaintiff avers

_____

[3]In fact, the ITC avers that throughout the period
contemporaneous with this review, it applied a "probable"
standard, and its advancement of a "possible" standard in the
<u>Usinor</u> cases was due to a fundamental misconception; i.e., that
the Court used the word "probable" to connote a high degree of
certainty, rather than "more likely than not." <u>See</u> Def.'s Mem.
Opp'n to Pl.'s Mot. for J. on the Agency Rec. at 8-10 ("Def.'s
Br."). However, because nothing in the ITC's actual sunset
review determination reflects this understanding, or lack
thereof, the ITC's argument may be nothing more than <u>post</u> <u>hoc</u>
rationale.
     At the same time, the ITC makes the curious and wholly
unpersuasive argument that while the Court may have defined
"likely" as "probable," it is up to the ITC to define the word
"probable," and that, moreover, any definition of  "probable"
that the ITC adopts should receive <u>Chevron</u> deference. <u>See</u> Def.'s
Br. at 11. <u>Chevron</u> deference applies only to agency
interpretation of an ambiguous statutory term. <u>See</u> <u>Chevron</u>
<u>U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S.
837, 843 (1984). Where a statutory term has a plain meaning, as
it does here, the plain meaning is just that; it requires no
further elucidation on the agency's part. Furthermore, even were
the ITC's interpretation of a definition, rather than a statutory
term, somehow susceptible to <u>Chevron</u> deference, the Court notes
that the ITC does not appear to have actually advanced any
meaning for the word "probable" before this Court, other than to
say that "probable" indicates no particular level of certainty.
It does; it requires that something be "more likely so than not."
<u>A.G. der Dillinger Huttenwerke v. United States</u>, slip-op. 02-107
at 18 & 18 n.14 (CIT Sept. 5, 2002).
     The Court notes the that the ITC's argument may be an
indirect way of stating that the ITC still believes that the
statutory term "likely" is ambiguous, and that, therefore, the
ITC's definition of "likely" is due <u>Chevron</u> deference. However,
as discussed above, the Court has repeatedly found that the term

that the ITC's determination does not show that the ITC employed a "more likely than not" standard in evaluating the evidence here. In addition, Plaintiff claims that, in light of previous cases dealing with contemporaneous reviews that found that the ITC may have employed the wrong standard, and contemporaneous statements by the ITC arguing for or advancing a "possible" standard, the ITC's determinations on this sunset review must be remanded as not in accordance with law.  See Pl.'s Br. at 12, 16-19.

Plaintiff is at least partially correct.  Although the ITC, in the Commission's Views, constantly references the statutory "likely" standards, nothing in its determination indicates whether it used "likely" to mean "more likely than not" or something less. The ITC does not discuss the meaning of "likely," and the substance of the Commission's Views does not reveal the use of a particular standard.   The ITC's use of an incorrect standard in contemporaneous reviews, the ITC's confused arguments regarding the standard it used in this review, and the failure of the Commission's Views to identify the standard used in this review all render the determination unclear on this issue.  It therefore cannot be sustained as in accordance with law.  On remand, the Court directs the ITC to make clear which standard it used in this determination, and if it employed a "possible," rather than "more

"likely" is not ambiguous; therefore, Chevron deference is not appropriate in this proceeding.

likely than not" standard, to reconsider its findings accordingly.

B. <u>Given the Proper Standard of Review, the ITC's Findings on Cumulation are Supported by Substantial Evidence, While ITC's Findings on Material Injury Are Not So Supported</u>

While the ITC's failure to clearly indicate what it meant by "likely" requires remand of its decision, regardless of what definition of "likely" was actually employed, for reasons of judicial and administrative economy, the Court will also now consider whether the evidence upon which the ITC based its material injury determination was substantial enough to support an affirmative finding under the correct, "probable" standard. Therefore, the Court will now review whether, given the correct standard, the ITC had substantial evidence on the record for the determinations that Plaintiff challenges. Plaintiff challenges two determinations. First, Plaintiff challenges the ITC's decision to cumulate imports from Argentina, Brazil, and Germany as unsupported by substantial evidence on the record. <u>See</u> Pl.'s Br. at 20. Second, Plaintiff challenges the ITC's determination that the cumulated imports would be such as to create a likelihood of recurrence of material injury as unsupported by the record evidence. <u>See</u> Pl.'s Br. at 22. The Court will discuss each determination in turn.

1. <u>The ITC's Findings on Cumulation Are Supported by Substantial Evidence</u>

The ITC engages in a two-step analysis in deciding whether to cumulate imports in a sunset review.  First, the ITC must determine whether that the imports from each country would be likely to have no discernible impact on the U.S. market.  See 19 U.S.C. § 1675a(a)(7).  The ITC did not find that the imports would likely have no discernible impact in this case and Plaintiff does not challenge this issue.  See Commission's Views, CR List. 2, Doc. No. 78 at 13.  Second, the ITC must find that the imports it seeks to cumulate would likely compete with each other and with the domestic product.  See 19 U.S.C. § 1675a(a)(7). It is this latter finding which Plaintiff challenges.  See Pl.'s Br. at 20.

In deciding whether subject imports would be likely to compete with each other and the domestic product in the event of revocation, the ITC traditionally considers four subfactors: (1) the degree of fungibility between the imports from different countries and the domestic like product, (2) the existence of common or similar channels of distribution for imports and the domestic like product, (3) the presence of sales or offers to sell in the same geographical markets, and (4) whether the imports are simultaneously present in the market. See, e.g., Wieland Werke, AG v. United States, 13 CIT 561, 563,  718 F. Supp. 50, 52 (1989) (citation omitted).  The four subfactors are neither exhaustive nor exclusive, nor is any single factor determinative.  Id. (citation omitted).  In the instant matter, the ITC found that all four

subfactors supported a finding that the imports would compete with each other and with the domestic like product.  See Commission's Views, CR List 2, Doc. No. 78 at 13-15.   The Court will discuss each of the four subfactors in turn.

First, the ITC considered the degree of fungibility between SLP from Argentina, Brazil, Germany, and the U.S.  See Commission's Views, CR List 2, Doc. No. 78 at 14-15.  Degree of fungibility refers to the degree to which consumers of SLP find foreign and domestic SLP substitutable for one another.  See id.; see also Corus Staal BV v. United States Int'l Trade Comm'n, CIT Slip. Op. 03-32 at 24 (Mar. 21, 2003).  The ITC noted that in the material injury determination underlying the original antidumping orders on SLP from the Argentina, Brazil, and Germany, foreign SLP was found to be a "reasonably good substitute[]" for domestic SLP.  See Commission's Views, CR List 2, Doc. No. 78 at 14.  Moreover, responses from questionnaires issued for the sunset review revealed that U.S. importers of SLP found SLP from Argentina, Brazil, Germany, and the U.S. to be interchangeable.  Id.  While the Commission found that most domestic purchasers of SLP require that SLP comply with standards set by either the American Society for Testing and Materials or the American Petroleum Insitute, the Commission noted that no domestic purchasers of SLP indicated that SLP from Argentina, Brazil, or Germany failed to comply with such standards.  Id.  Therefore, the ITC appears to have found that the

subfactor of fungibility was satisfied.

It is unclear whether Plaintiff challenges this subfactor. See Pl.'s Br. at 20; Pl.'s Reply Br. at 5-6. Plaintiff points to no record evidence that was ignored by the ITC in making its fungibility finding, nor to any reasonable alternate view of the available evidence with which the ITC failed to grapple.[4] See id. Neither does Plaintiff point to evidence which, although not on the record, should have been placed there, and which would counter the ITC's fungibility finding. See id. Therefore, the Court finds that the ITC's finding that the subject merchandise was fungible inter se and with the domestic like product was supported by substantial record evidence.

The second subfactor is the existence of common or

---

[4]The ITC also points out, in the course of its fungibility discussion, that price is one of the three most important factors in SLP purchasing decisions. See Commission's Views, CR List 2, Doc. No. 78 at 14. One of the surveys of purchasers conducted by the ITC indeed shows this result, but a second survey indicates that there are five factors which surpass price in purchasing decisions, regarding two of which respondents found domestic SLP superior to foreign SLP. See Certain Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe from Argentina, Brazil, Germany, and Italy, Staff Report to the Commission on Investigations Nos. 701-TA-362 and 731-TA-707-710 (Review), CR List 2, Doc. No. 76 at Page II-13 & Tables II-2, II-7 (May 24, 2001) ("Staff Report"). While the discrepancies between these two surveys does affect the ITC's consideration of the likely price effects of subject imports in the event of revocation, see discussion infra pp. 38-41, the Court does not believe it undermines the ITC's findings on fungibility here. The substantial record evidence, with which both surveys are consistent, indicates that foreign SLP would be interchangeable with domestic SLP for most purchasers.

similar channels of distribution. The ITC appears to have evaluated this subfactor by looking for evidence of whether foreign SLP and domestic SLP would be likely to be sold to the same customers. The Commission referred to the finding, in its original material injury determination underlying the antidumping orders on SLP from Argentina, Brazil, and Germany, that previous to the imposition of dumping orders, the subject merchandise operated in common or similar channels of distribution, in that it was sold to distributors, rather than directly to end-users. See Commission's Views, CR List 2, Doc. No. 78 at 14; see also Certain Seamless Carbon and Alloy Standard, Line, and Pressure Steel Pipe from Argentina, Brazil, Germany, and Italy, Investigations Nos. 701-TA-362 and 731-TA-707 through 710 (Final), USITC Pub. No. 2910, PR List 1, Doc. No. 55 at I-23 (July 1995) ("Original Determination").[5] Furthermore, the ITC indicated that the overwhelming majority of both domestic producers' sales and importers' sales during the sunset review period were to distributors, rather than to end-users. See Commission's Views, CR List 2, Doc. No. 78 at 15, 15 n.81. The ITC also noted that "[t]here is nothing in the record of [the sunset review] indicating that a significant overlap in the channels of distribution among

_____

[5]Documents contained on the public record are cited as "PR," followed by the document list in which they are contained, followed by the document number. Documents in the confidential record are cited as "CR," followed by the document list in which they are contained, followed by the document number.

subject imports and the domestic like product <u>would not be likely</u> upon revocation of the antidumping duty orders." <u>See</u> Commission's Views, CR List 2, Doc. No. 78 at 15 (emphasis added).

Siderca makes two challenges to the ITC's findings on the common channels of distribution subfactor. First, it alleges that it provided proof to the ITC that its imports would not compete in common or similar channels of distribution with domestic SLP. Pl.'s Br. at 20-21. Second, it challenges the manner in which the ITC framed its findings, claiming the ITC's particular choice of words is indicative of a lack of substantive evidence to support its findings. Pl.'s Br. at 13, 20. The Court will consider each argument in turn.

First, Siderca alleges that it provided proof to the ITC that its imports would not compete in common or similar channels with domestic SLP. Specifically, during the sunset review, Siderca stated that its focus would be on long-term contracts with end-users, rather than sales to distributors. <u>See</u> Commission's Views, CR List 2, Doc. No. 78 at 15 n.81. As proof of its end-user focus, Siderca submitted to ITC a chart showing that end-user sales had accounted for, in the year 2000, a majority of its sales of all steel goods production, including SLP. <u>See</u> Long Term Agreements, Ex. 3 to Resps. to Comm'r & Staff Post-Hr'g Questions, Attach. to Post Hr'g Br. of Siderca SAIC from Argentina, Attach. to Letter from David P. Houlihan et. al. to the Hon. Donna R. Koehnke, Sec'y,

U.S. Int'l Trade Comm'n, <u>Re: Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Argentina, Brazil, Germany, and Italy Invs. Nos. 701-TA-362 and 731-TA-707-710(Reviews)</u>, CR List 2, Doc. No. 49 (May 10, 2001). However, the ITC found that while the graph showed that the majority of Siderca's production and sales were bound to long-term, end-user contracts, the rest, a sizable minority, were not so bound. <u>See</u> Commission's Views, CR List 2, Doc. No. 78 at 15 n.81. Therefore, while Siderca may "prefer" the long-term, end-user market, a sizable amount of its SLP does not trade in the long-term, end-user market. <u>Id.</u>

Second, Siderca challenges the ITC's statement that "[t]here is nothing in the record of [the sunset review] indicating that a significant overlap in the channels of distribution among subject imports and the domestic like product <u>would not be likely</u> upon revocation of the antidumping duty orders." Commission's Views, CR List 2, Doc. No. 78 at 15 (emphasis added); <u>see also</u> Pl.'s Br. at 13, 20. Siderca challenges the statement on a logical, rather than an evidentiary or substantive basis, pointing out that there being no evidence on the record to refute a fact is not the same thing as there being evidence on the record to support it. <u>Id.</u> While true as a logical statement, the argument is inapposite here. In stating that there was no record evidence to show that subject imports would not compete with each other and the domestic like

product, the ITC does not appear to have been covering up an
absence of record evidence to support a finding that subject
imports would compete with each other and with the domestic like
product.  While there was very little evidence on the record
regarding common channels of distribution, what evidence there was
indicated that the distributor market is the predominate method by
which SLP is bought and sold in the United States.  This evidence
supported the ITC's finding that Argentine, Brazilian, and German
SLP would compete in the same distributor market as domestic SLP.
Moreover, the ITC explained why it did not find Siderca's end-user
argument persuasive, and Siderca has pointed to no other evidence
that could serve to persuasively rebut the ITC's finding that a
sizable amount of its SLP sales were not to long-term end-users,
and therefore must have moved in other markets, such as distributor
markets.[6]  Given this context, the ITC's statement that there was

---

[6]Siderca has not alleged that it was dissuaded from putting
evidence on the record during the investigation; moreover, it
refused to provide certain information, such as its business
plan, to the ITC.  See Siderca's Response to Foreign
Producers'/Exporters' Questionnaire: Certain Seamless Carbon and
Alloy Steel Standard, Line, and Pressure Pipe from Argentina,
Attach. 2 to Letter from David P. Houlihan & Lyle B. Vander
Schaaf, White & Case LLP, to Christopher Cassie, U.S. Int'l Trade
Comm'n, Office of Investigations, Re: Certain Seamless Carbon and
Alloy Steel Standard Line, and Pressure Pipe from Argentina et
al., Inv. Nos. 701-TA-362 & 731-Ta-707-710 (Review), CR List 2,
Doc. No. 29 at Question I-4 (Mar. 19, 2001).  The Court notes
that to the extent Siderca was actually in possession of
persuasive evidence and refused to provide it or did not take the
opportunity to place it on the record, it must bear the burden of
its behavior or inattention.

no record evidence to support a finding that subject imports would not compete with each other is simply a true, factual statement. There was no such record evidence. There was, however, evidence indicating that they would compete.[7]

Therefore, because the ITC placed on the record and discussed in the Commission's Views evidence which supported a finding that foreign SLP would have common or similar channels of distribution, and there was no evidence on the record to suggest otherwise, the Court finds that the ITC's finding that Argentine, Brazilian, and German SLP would have common or similar channels of distribution

---

[7]The Court recognizes that Plaintiff's underlying argument is that evidence from the original reviews alone cannot constitute "substantial" evidence justifying cumulation in this sunset review. See Pl.'s Br. at 20-21. Almost no SLP was imported to the United States from the subject producers during the five years preceding the sunset review; hence, there is no evidence relating to the sunset review period on most of the cumulation subfactors. See Staff Report, CR List 2, Doc. No. 76 at Tables IV-3, IV-5, and IV-7. According to Plaintiff's argument, while the findings underpinning the original orders may have some evidentiary value, they do not rise to the level of substantial evidence. Plaintiff's argument, however, is overly broad. What constitutes substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (citations omitted), depends, of course, on the conclusion being supported. Given that the conclusion to be supported here is that subject producers will avail themselves of the distributor market should they sell in the U.S., evidence that the distributor method of buying and selling SLP is the only one current with importers in the United States, represents the majority of sales of domestic SLP producers, and that subject producers used this method when they previously sold SLP to the U.S. market, appears to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

with domestic SLP is supported by substantial evidence.

The third subfactor in the cumulation analysis is the likely presence of sales or offers to sell in the same geographical markets. In finding that foreign SLP was likely to compete in the same geographical areas as domestic SLP, the ITC relied on the findings in its original material injury determination that imports had competed directly, and nationwide, with domestic SLP before the orders were issued. See Commission's Views, CR List 2, Doc. No. 78 at 15. The only other record evidence relevant to the topic was the indication by both domestic producers and importers of SLP that, during the sunset review period, they served the entire continental United States. Id. at 15 n.84.

Siderca faults the ITC for relying so heavily on its original determination in making the findings here. See Pl.'s Br at 20-21. Siderca points out that it did not import subject merchandise to the United States during the period covered by the sunset review.[8] Siderca appears to infer from this that there cannot be substantial evidence to support a finding that subject merchandise would likely compete in the same geographic areas as domestic SLP or to support a finding that subject merchandise would be simultaneously present

[8]Exports of SLP to the United States from Brazil and Argentina were at [***] during the period of review; exports of SLP to the United States from Germany ranged between a low of [less than ***] short tons in 1999 and a high of [more than ***] short tons in 1998. See Staff Report, CR List 2, Doc. No. 76 at Tables IV-3, IV-5, and IV-7.

in the market with domestic SLP.

Siderca's challenge to the ITC's handling of this subfactor is unpersuasive. While it is true that there was virtually no importation of SLP from the subject countries during the period covered by the sunset review, given that U.S. SLP producers sell nationwide, even were an importer of SLP only to focus on a small area of the country, the importer would necessarily be competing in the same geographic area as the domestic SLP producers. Therefore, the ITC's finding that foreign SLP was likely to compete geographically with domestic SLP is supported by substantial evidence.

The fourth subfactor that ITC traditionally considers with regard to cumulation is simultaneous presence in the market. This factor appears to relate to whether goods are in the market at the same time. The Original Determination found that there had been direct competition between subject and domestic SLP for at least 27 straight financial quarters. See Original Determination at I-23, 23 n.128;[9] see also Original Staff Report at I-115.[10] Moreover, the

---

[9]While the Original Determination did find that there had been competition for at least 27 quarters, this finding appears to be based on a misreading of the staff report accompanying the Original Determination. The Original Determination cites to page 115 of the accompanying staff report for the proposition that there had been competition for at least 27 quarters. See Original Determination at I-23, 23 n.128. However, the data on that page instead shows that there had been at least 27 individual price comparisons over four years. Staff Report (INV-S-097) Original (Final) at I-115 (July 1995) ("Original Staff Report"). Although the Original Determination cited to this

Court has located no evidence on the record, or any argument in the briefs, suggesting that the SLP market is a seasonal market, such that foreign SLP would be available at set times when domestic SLP was not. The proposition to be supported is that steel products are not seasonal goods such that domestic and foreign producers will sell the goods at mutually exclusive time periods. It appears to the Court that the original determination provides such evidence as would enable a reasonable mind to find that the proposition is supported.

In conclusion, the Court finds that the ITC's determinations on all four subfactors are supported by substantial evidence on the record. The ITC amassed evidence showing that the foreign and domestic like products were considered good substitutes by consumers. The ITC demonstrated that there is a predominant channel of distribution for SLP in the United States, and discussed, if briefly, Plaintiff's substantive objections to its analysis of this issue. The ITC amassed evidence which shows

incorrectly, the substantive import of its finding remains true: both domestic and foreign SLP had competed simultaneously in the U.S. market during the original period of review.

[10]The Original Staff Report was not listed as part of the certified administrative record in this case. Nevertheless, it is cited to by the Original Determination, and can therefore fairly be taken as incorporated by reference. A copy of the confidential version of the Original Staff Report was provided to the Court by the ITC, and is now on file with the Court. However, because it was not listed as part of the certified administrative record, it does not have a list or document number.

conclusively that foreign imports would compete in the same geographic markets as domestic SLP, and finally, the evidence on likely simultaneous presence, while scanty, is sufficient to enable a reasonable mind to find the proposition supported. Therefore, the Court finds that the ITC's cumulation determination was supported by substantial evidence and thus, cumulation of the volume and effect of Argentine, Brazilian, and German imports was proper.

### 2. The ITC's Findings on Material Injury Are Not Supported by Law or Substantial Evidence

Having found that the ITC's cumulation decision is supported by substantial evidence on the record, the Court will discuss the ITC's finding that revocation of the antidumping orders is likely to lead to a continuation or recurrence of material injury to the domestic SLP industry within a reasonably foreseeable period of time. To make an affirmative finding that material injury is likely to recur, the ITC is statutorily required to evaluate three factors and determine that these factors support a finding that revocation would lead to material injury in a "reasonably foreseeable" period of time. See 19 U.S.C. § 1675a(a)(1). These three factors are (1) the likely volume of subject imports, (2) the likely price effects of subject imports, and (3) the likely impact of subject imports. Id. Plaintiff challenges the ITC's findings on all three factors; the Court discusses each factor in turn. See

Pl.'s Br. at 22, 29, 31.


            i.    ITC's Findings on the Likely Volume of Imports
                  Is Not in Accordance with Law and is Not
                  Supported By Substantial Evidence.

     The first factor concerns the likely volume of subject imports

in the event of revocation.  See 19 U.S.C. § 1675a(a)(2)(A)-(D).[11]

---

[11]Title 19 U.S.C. § 1675a(a)(2)-(4) describes the three main
factors that the ITC is to consider (volume, price, and impact),
as well as the each factor's corresponding subfactors:

(2) Volume

  In evaluating the likely volume of imports of the subject
merchandise if the order is revoked or the suspended
investigation is terminated, the Commission shall consider
whether the likely volume of imports of the subject merchandise
would be significant if the order is revoked or the suspended
investigation is terminated, either in absolute terms or relative
to production or consumption in the United States. In so doing,
the Commission shall consider all relevant economic factors,
including—

     (A) any likely increase in production capacity or existing
  unused production capacity in the exporting country,

     (B) existing inventories of the subject merchandise, or
  likely increases in inventories,

     (C) the existence of barriers to the importation of such
  merchandise into countries other than the United States, and

     (D) the potential for product-shifting if production
  facilities in the foreign country, which can be used to
  produce the subject merchandise, are currently being used to
  produce other products.

(3) Price

  In evaluating the likely price effects of imports of the
subject merchandise if the order is revoked or the suspended
investigation is terminated, the Commission shall consider
whether—

     (A) there is likely to be significant price underselling by
  imports of the subject merchandise as compared to domestic

The ITC is statutorily mandated to consider four subfactors in
evaluating the likely volume of imports.  These four subfactors,
which are non-exclusive, include: (1) any likely increase in the
production capacity or existing unused production capacity in the
exporting country; (2) existing inventories of the subject
merchandise; or likely increases in inventories, (3) the existence
of barriers to the importation of such merchandise into countries

---

like products, and

   (B) imports of the subject merchandise are likely to enter
the United States at prices that otherwise would have a
significant depressing or suppressing effect on the price of
domestic like products.


   (4) Impact on the industry
   In evaluating the likely impact of imports of the subject
merchandise on the industry if the order is revoked or the
suspended investigation is terminated, the Commission shall
consider all relevant economic factors which are likely to have a
bearing on the state of the industry in the United States,
including, but not limited to—

   (A) likely declines in output, sales, market share, profits,
productivity, return on investments, and utilization of
capacity,

   (B) likely negative effects on cash flow, inventories,
employment, wages, growth, ability to raise capital, and
investment, and

   (C) likely negative effects on the existing development and
production efforts of the industry, including efforts to
develop  derivative or more advanced version of the domestic
like product.


The Commission shall evaluate all relevant economic factors
described in this paragraph within the context of the business
cycle and the conditions of competition that are distinctive to
the affected industry.

19 U.S.C. § 1675a(a)(2)-(4).

other than the United States; and (4) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products. See 19 U.S.C. § 1675a(a)(2). The ITC appears to have considered two additional subfactors as well, for a total of six subfactors: (5) the extent to which the exporting countries' SLP production was export-driven; and (6) the international business affiliations of the manufacturers in the exporting countries. See Commission's Views, CR List 2, Doc. No. 78 at 25-27. The Court will discuss the ITC's treatment of each subfactor in turn, and then discuss whether, together, they support a finding that the likely volume of subject imports upon revocation support a further finding that material injury was likely to continue or recur.

The first subfactor involves the effects of any likely increase in the exporting countries' production capacity or existing unused production capacity in the exporting country. See 19 U.S.C. § 1675a(a)(2)(A). Subject manufacturers' overall capacity to produce subject merchandise declined during the period of review, but the ITC found that they maintained some excess capacity. See Staff Report, CR List 2, Doc. No. 76 at Tables IV-3, IV-5, and IV-7; Commission's Views, CR List 2, Doc. No. 78 at 24, 24 n.147.

The second subfactor involves existing inventories of the

subject merchandise, or likely increases in inventories.  See 19 U.S.C. § 1675a(a)(2)(B).  The ITC found that while Brazil and Germany did not maintain inventories of the subject merchandise during the POR, Argentina's end-of-period inventories for 2000 totaled [almost ***] short tons, a figure that was roughly average for Argentina during each year of the period of review, and amounted to a fairly small percentage of Argentine SLP production for 2000.  See Commission's Views, CR List 2, Doc. No. 78 at 26 n.156; Staff Report at Tables IV-3, IV-5, and IV-7.  The ITC also found that while there were no reported U.S. end-of-year inventories of Brazilian or German SLP during the period of review, U.S. importers did hold a very small stock of Argentine SLP in inventory at the end of the years 1997-2000.  See Commission's Views, CR List 2, Doc. No. 78 at 26 n.156; Staff Report, CR. List 2, Doc. No. 76 at Table IV-2.

The third subfactor is the existence of barriers to the importation of such merchandise into countries other than the United States.  See 19 U.S.C. § 1675a(a)(2)(C).  The ITC found that the exporting countries did not face antidumping orders from countries other than the U.S., but Brazilian and German SLP faced high tariffs or non-tariff barriers in a number of other countries.  See Commission's Views, CR List 2, Doc. No. 78 at 25 n.153.

The fourth subfactor is the potential for product-shifting if production facilities in the foreign country, which can be used to

produce the subject merchandise, are currently being used to produce other products.[12]  See 19 U.S.C. § 1675a(a)(2)(D).  The ITC notes that the exporting countries can produce SLP on the same machines that they employed, during the POR, to make other products such as mechanical and boiler tubing and oil country tubular goods ("OCTG").  See Commission's Views, CR List 2, Doc. No. 78 at 24.  The ITC noted that SLP producers reported that they can shift production between subject merchandise and other products[13] and that

_____

[12]Siderca challenges ITC's determination on product-shifting as not hewing to a likelihood standard.  See Pl.'s Br. at 13.  The ITC replies that 19 U.S.C. § 1675a(a)(2)(A)(D), which describes the product-shifting subfactor, requires ITC to evaluate the "potential" for product-shifting rather than the "likelihood" thereof.  See Def.'s Br. at 20.  Rather than simply misstating the statutory standard, Siderca appears to be arguing that, having no persuasive evidence on the other three statutory factors, the ITC relied solely on its findings on "potential" product-shifting to conclude that the likely volume of imports was sufficient to support of a finding of likely recurrence of material injury.  See Pl.'s Br at 13.  While the ITC is statutorily required to evaluate certain factors, it does not necessarily follow that even if it found that all were satisfied, its volume determination would be supported by substantial evidence.  That depends on the facts of the particular determination.  However, as the Court finds that the ITC has not amassed sufficient evidence to support a finding that there is a meaningful potential for product-shifting, see infra pp. 30-31, it need not reach this issue.

[13]The Court notes that neither the Commission's Views nor the Staff Report indicate where in the record SLP producers reported their ability to shift production; neither do the Commission's Views or the Staff Report indicate whether producers were reporting their ability to physically turn their plants over to SLP production from production of other goods, the economic feasibility of doing so, or both.  See Commission's Views, CR List 2, Doc. No. 78 at 24; Staff Report, CR List 2, Doc. No. 76 at Tables IV-4, IV-6, IV-8, Pages IV-4, IV-8, IV-12, and IV-15.  For further discussion of this issue and its effects on this

their overall capacity to produce all products is quite high.  Id.;

see also Staff Report, CR List 2, Doc. No. 76 at Tables IV-4, IV-6,

IV-8, and Pages IV-4, IV-8, IV-12, and IV-15 to IV-16.  The ITC

also noted that the record indicates that SLP prices are generally

higher in the U.S. than elsewhere.  See Commission's Views, CR List

2, Doc. No. 78 at 24-25; Staff Report, CR List 2, Doc. No. 76 at

Pages V-17 to V-18.  The ITC states that Argentina would have a

special incentive for switching production to SLP, as there is a

U.S. antidumping order in place on Argentine OCTG. See Commission's

Views, CR List 2, Doc. No. 78 at 25 n.151.[14]

---

instant case, see infra pp. 30-31 and 31 n.16.

[14]Siderca again argues that it would be unlikely to shift sales to the U.S. market because of its commitments to long-term end-users outside the United States.  Pl.'s Br. at 25-26.  Again, the ITC replies that a significant minority of its SLP production does not appear to be bound to any long-term contracts.  Def.'s Br. at 27.  Given the amount of SLP that Argentina produces per year, were it all redirected toward the U.S. market, it would constitute a significant amount.  See Staff Report, CR List 2, Doc. No. 76 at Table IV-3.  Moreover, Siderca provides no evidence to support its claim that it would not switch sales of SLP to the U.S market other than the aforementioned chart showing that the majority of its production of all steel goods, including SLP, is already contract-bound.  See Long Term Agreements, Ex. 3 to Responses to Commissioner & Staff Post-Hearing Questions, Attach. to Post Hearing Brief of Siderca SAIC from Argentina, Attach. to Letter from David P. Houlihan et. al. to the Hon. Donna R. Koehnke, Sec'y, U.S. Int'l Trade Comm'n, Re: Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Argentina, Brazil, Germany, and Italy Invs. Nos. 701-TA-362 and 731-TA-707-710(Reviews), CR List 2, Doc. No. 49 (May 10, 2001).
    Siderca moreover argues that it would not be able to shift production away from other goods into SLP, so as to have more SLP to sell to the U.S. market, because its current production of other steel goods is also heavily contract-bound.  See Pl.'s Br.

The fifth subfactor that the ITC considered is that of the export-driven nature of the exporting countries. See Commission's Views, CR List 2, Doc. No. 78 at 26. The ITC found that the reviewed countries produced heavily for the export market, with the significant majority of Argentina and Germany's production going abroad, and roughly a third to a half of Brazil's production going abroad. See Commission's Views, CR List 2, Doc. No. 78 at 26 n.155; see also Staff Report, CR List 2, Doc. No. 76 at Tables IV-3, IV-5, and IV-7.

The sixth subfactor considered was the transnational corporate affiliations of the manufacturers in the exporting countries. See Commission's Views, CR List 2, Doc. No. 78 at 26. The ITC found that the corporate affiliations of many of the subject country producers would provide a ready network for marketing, sales, and distribution, enhancing the producers' ability to resume exportation to the United States. Id.

The ITC is not particularly clear as to how it combines the individual subfactors into a coherent whole, but, taken together, it appears that the ITC rests its finding regarding the likely volume on the following considerations: (1) the producers' overall capacity to produce all steel goods, combined with their physical

at 26-27. The ITC again points toward Siderca's Long Term Agreements Chart, which covers all of Siderca's steel goods production. That chart, as mentioned before, shows that a sizable minority of Siderca's steel goods production is not contract bound.

ability to product-shift; (2) the export-driven nature of the subject producers' SLP production; and (3) their international corporate contacts. The ITC appears to hold that the combination of its findings on these three factors make it likely that upon revocation of the antidumping order, there would be an influx of SLP imports from the subject countries of sufficient volume to cause a recurrence of material injury. See Commission's Views, CR List 2, Doc. No. 78 at 26. While this analysis may be unobjectionable as far as it goes, to be supported by substantial evidence, there must be "a rational connection between the facts found and the choice made." Burlington Truck Lines Co. v. United States, 371 U.S. 156, 168 (1962).[15] The Court cannot conclude that the ITC's finding of a likely volume of imports sufficient to support a finding of material injury are justified, for two reasons. First, while the ITC has shown that the subject producers have a significant overall capacity to produce steel goods and are

---

[15]Moreover, as the Supreme Court noted in SEC v. Chenery Corp., an agency's failure to articulate with precision the basis of its determination renders the determination unsuitable for substantial evidence review:

> If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.

SEC v. Chenery Corp., 332 U.S. 194, 196-97 (1947).

export-driven, the ITC has not made clear how it concludes that there is a meaningful potential for product-shifting. Second, the ITC has not explained how the subject producers' international corporate contacts support its findings.

First, the ITC's analysis of the potential for product-shifting is not in accordance with law. The ITC rests its finding of a potential for product-shifting solely on a finding that such shifting is physically possible. The ITC never inquires into whether such a shift makes economic sense for the subject-country producers; i.e, whether the prices for SLP in the U.S. would economically justify a product-shift away from mechanical and boiler tubing and OCTG. However, the language of 19 U.S.C. § 1675a(a)(2)(D) indicates that something more than physical ability to product-shift must be found in order to satisfy the product-shifting subfactor.

Specifically, the statute directs the ITC to consider the potential for product-shifting "if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products." 19 U.S.C. § 1675a(a)(2)(D). Under the statute, the physical ability to produce subject merchandise using facilities now otherwise occupied is the necessary condition for considering the potential for product shifting. Such physical ability does not, on its own, indicate that the subfactor is satisfied. To hold

otherwise would render the first clause of 19 U.S.C. § 1675a(a)(2)(D) superfluous. If the mere physical ability to product-shift was sufficient to show the "potential" to product-shift, then there would be no reason to direct the ITC to consider that potential above and beyond a finding of the physical ability to product-shift. Therefore, the Court must conclude that Congress intended 19 U.S.C. § 1675a(a)(2)(D) to be satisfied only when, in addition to the physical ability to product-shift, product-shifting was otherwise a viable option.[16]

---

[16]Given that the subject country producers are profit-making entities, their potential for doing anything rests inherently on their ability to afford it, e.g., because it makes them a profit, or because a short-term loss is worth the risk in order to profit later. While the ITC has provided evidence to support the notion that prices for SLP are generally higher in the U.S. than elsewhere, this alone does not answer the question of whether product-shifting is at all economically feasible, and hence, a potential option for the subject country producers. See Commission's Views, CR List 2, Doc. No. 78 at 24; Staff Report, CR List 2, Doc. No. 76 at Pages V-17 to V-18.

Indeed, ITC does not appear totally unaware that the economic feasibility of product-shifting is relevant to the product-shifting subfactor. In its questionnaire to foreign producers, ITC asked that producers indicate whether they could product-shift "in response to a relative price change" for SLP vis-a-vis other products, using the same equipment or labor, and furthermore questioned producers concerning the cost of switching and what sort of price change would induce product-switching, a question which naturally might implicate producers relative profit margins for other goods. However, almost all the foreign producers indicated that they could not switch between products because it was not economically feasible. See Siderca S.A.I.C.'s Response to Foreign Producers'/Exporters' Questionnaire: Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Argentina, Attach. 2 to Letter from David P. Houlihan & Lyle B. Vander Schaaf, White & Case LLP, to Christopher Cassie, U.S. Int'l Trade Comm'n, Office of Investigations, Re: Certain Seamless Carbon and Alloy Steel Standard Line, and Pressure Pipe

The ITC does not indicate exactly how much weight it gives the product-shifting subfactor, but under the Court's reading of the Commission's Views, it appears to be substantial. Given that the evidence supporting the other three statutory subfactors is minimal at best, it appears to the Court that if the ITC's volume finding is to be supported by substantial evidence and in accordance with law, the ITC must indicate something beyond the mere physical possibility of product-shifting, and show that product-shifting is potentially a rational economic option in light of revocation of the orders.[17, 18]

_____

from Argentina et al., Inv. Nos. 701-TA-362 & 731-Ta-707-710 (Review), CR List 2, Doc. No. 79 at Question II-9 (Mar. 19, 2001); Dalmine SpA's Response to Foreign Producers'/Exporters' Questionnaire: Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Italy, Attach. 1 to Letter from David P. Houlihan & Lyle B. Vander Schaaf, White & Case LLP, to Christopher Cassie, U.S. Int'l Trade Comm'n, Office of Investigations, Re: Certain Seamless Carbon and Alloy Steel Standard Line, and Pressure Pipe from Argentina et al., Inv. Nos. 701-TA-362 & 731-Ta-707-710 (Review), CR List 2, Doc. No. 79 at Question II-9 (Mar. 19, 2001); Vallourec & Mannesman Tubes SA's Response to Foreign Producers'/Exporters' Questionnaire: Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Germany, CR List 2, Doc. No. 82 at Question II-9 (Mar. 19, 2001) (Vallourec & Mannesman Tubes SA, although headquartered in France, produces SLP in Germany and Brazil, and exports SLP from those facilities). Only one foreign producer, Pietra SpA, indicated that it could switch; however, Pietra SpA indicated only that it could use the same equipment it currently uses to produce goods such as mechanical tubing to produce SLP, without addressing economic factors. See Pietra SpA's Response to Foreign Producers'/Exporters' Questionnaire: Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Italy, CR List 2, Doc. No. 80 at Question II-9 (Mar. 13, 2001).

[17]Of course, product-shifting may be irrelevant if the SLP currently produced by the subject country manufacturers could be

Second, the ITC appears to give weight to the transnational corporate affiliations of the subject country producers. See Commission's Views, CR List 2, Doc. No. 78 at 26-27. Again, the ITC does not indicate how much weight it ascribes to this factor; it is therefore difficult for the Court to evaluate its importance in relation to the substantial evidence standard. Be that as it may, the ITC describes how several of the subject country producers belong to large conglomerates. Id. at 26 n.158. The ITC furthermore argues that cross-ownership among foreign subject producers "appears to be enhancing their ability to supply seamless pipe customers with operations in the United States and abroad through flexible supply arrangements, including global contracts." Id. at 26-27. In support of this, the ITC cites to the Staff Report's discussion of pricing practices in the SLP market. See id. at 27 n.160; Staff Report, CR List 2, Doc. No. 76 at Page V-7.

---

re-directed to the U.S. market in sufficient quantity to affect the U.S. market, but the Commission's Views do not rely on this claim. While the ITC notes that the volume of SLP currently produced by the subject countries amounts to more than current U.S. demand, the ITC appears to make no argument regarding the likely volume of the subject countries' exports to the United States in the absence of product-shifting. See Commission's Views, CR List 2, Doc. No. 78 at 24.

[18]While the ITC states that Argentina would have a special incentive for switching production over to SLP, as there is a U.S. antidumping order in place on Argentine OCTG, it fails to indicate what amount of OCTG would likely be supplanted by SLP and whether this would be significant. See Commission's Views, CR List 2, Doc. No. 78 at 25 n.151.

The Staff Report states that respondents gave mixed responses on the issue of whether there is "an increasing trend on the part of some end users toward using global contracts." Staff Report, CR List 2, Doc. No. 76 at Page V-7. The ITC does not make it clear how it leaps from respondents' mixed views of a possible contracting trend to the conclusion that the subject country producers have contacts that will accelerate their marketing and distribution into the United States.[19]

Therefore, the Court remands the ITC's volume finding for further investigation and discussion of the potential for product-shifting, and for clarification on how transnational corporate affiliations affect the volume calculus.

> ii. <u>ITC's Findings on the Likely Price Effects of Imports Are Not Supported By Substantial Evidence</u>

Having discussed the ITC's treatment of the likely volume factor in its material injury determination, the Court will consider the second factor: likely price effects of subject imports in the event of revocation. The ITC is statutorily required to

---

[19]The ITC does state that one German subject producer is part of a conglomeration that currently ships SLP to the United States from a country not subject to an antidumping order. <u>See</u> Commission's Views, CR List 2, Doc. No. 78 at 26 n.158. Conceivably, the parent corporation could use the distribution network it has for importing SLP from the non-subject country to help its subject country subsidiary, were the order revoked, but the ITC does not make this argument, preferring to allow the mere suspicion to masquerade as evidence.

consider two subfactors in evaluating the likely price effects. These are (1) whether there is likely to be significant underselling by the subject imports as compared with the domestic like product and (2) whether the subject imports are likely to enter the United States at prices that would have a significant depressing or suppressing effect on the price of domestic like products. See 19 U.S.C. § 1675a(a)(3). The main controversy on these facts concerns whether or not the ITC's findings with regard to the first subfactor are such as to support a finding of likely continuation or recurrence of material injury.[20]

---

[20]Plaintiff does challenge the ITC's findings as to the second subfactor, whether the subject imports are likely to enter the United States at prices that would have a significant depressing or suppressing effect on the price of domestic like products. See 19 U.S.C. § 1675a(a)(3). However, while Plaintiff does point out an underlying inconsistency in ITC's statement of its findings, the Court is not convinced that any particularly substantial error on the ITC's part has occurred.

In its discussion of the second subfactor, the ITC notes that the original investigation found significant "price depressing and suppressing effects." See Commission's Views, CR List 2, Doc. No. 78 at 27. ITC then notes that given the likely volume of subject imports, the lower prices for foreign SLP reported by purchasers, and a record of consistent underselling in the original investigation, the revocation of the antidumping orders will lead to exports with likely significant price depressing and suppressing effects. See id. at 28.

First, to the extent that this finding is based on the ITC's discredited determinations regarding volume and the importance of price in the SLP market, it must be remanded for reevaluation in light of the remand determinations on those issues. Second, the Court finds that to the extent that it is ambiguous to say that both price suppression and depression will occur, the finding will be remanded for clarification.

Price depression occurs when firms lower the price of goods in order to maintain market share in the face of low-cost competition. Price suppression occurs when a firm maintains its

The first subfactor is whether there is likely to be significant underselling by the subject imports as compared with the domestic like product. See 19 U.S.C. § 1675a(a)(3)(A). The ITC first notes that the original investigations found that price was an important factor in purchasing decisions, and that subject imports significantly undersold the domestic like product during the period of investigation. See Commission's Views, CR List 2, Doc. No. 78 at 27. The ITC also finds that a majority of producers and importers reported that differences other than price between

current price rather than increasing it, in response to low-cost competition. A single firm cannot, of course, lower prices and maintain prices simultaneously. However, because firms may react differently to low-cost competition, there may be some firms that respond with depressed prices and others that respond with suppressed prices. This appears to have happened in the original investigation: some firms alleged lost sales, others lost revenues. See Original Determination, PR List 1, Doc. No. 55 at I-29, Original Staff Report at I-120 to I-129. Changes in market conditions also meant that the industry as a whole varied its response from suppression to depression and back. See Original Determination, PR List 1, Doc. No. 55 at I-29. With regard to the original investigation, it therefore would make sense to describe the subject imports as having "price depressing and suppressing effects." See Commission's Views, CR List 2, Doc. No. 78 at 27.

However, in now finding that both price depression and suppression are likely to result from revocation of the order, the ITC does not make clear whether it contemplates that in the event of revocation, some firms will lower prices, and some will maintain them, or whether market conditions will favor one scenario, and then the other. See Commission's Views, CR List 2, Doc No. 78 at 28. Without this necessary context, it appears that the ITC is stating that prices will simultaneously go down and stay the same across the entire industry. The Court therefore remands this finding for review in light of the remand findings on volume, and, inasmuch as the conclusions are the same, clarification as to how price suppression and depression will occur.

the domestic and subject product are generally not a significant factor in their sales.  See id. at 27-28.[21]  Finally, the ITC finds that price and quality were the two factors ranked highest by purchasers in making purchasing decisions, and that a majority of purchasers indicated that subject imports are cheaper than the domestic like product.[22]  See id. at 28.

---

[21]The Court notes however, that there was disagreement as to whether price itself was a significant factor.  See Staff Report, CR List 2, Doc. No. 76 at Page II-17.

[22]This appears to be somewhat of a misstatement on the ITC's part, although it is partially clarified by a footnote. See Commission's Views, CR List 2, Doc. No. 78 at 28, 28 n.170. Although twenty domestic purchasers of SLP responded to the ITC's questionnaires (see Responses to Purchasers' Questionnaire, Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Argentina, Brazil, Germany, and Italy, CR List 2, Doc. Nos. 111, 113-118, 121-132 (including 127A) (Doc. Nos. 112 and 118 represent non-responses)), fewer than half appear to have answered any of ITC's specific questions regarding price comparison between domestic SLP and SLP from Argentina, Brazil, Germany, and Italy. See Responses to Purchasers' Questionnaire, Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Argentina, Brazil, Germany, and Italy, CR List 2, Doc. Nos. 114, 117, 118, 123, 126-129 at Question IV-6. According to the ITC, all three responding purchasers on the question of Brazilian SLP prices indicated that Brazilian SLP was more cheaply priced than domestic SLP. See Commission's Views, CR List 2, Doc. No. 78 at 28 n.170; Staff Report, CR List 2, Doc. No. 76 at Page V-17.  Four out of five purchasers responding to a question on the price of Argentinian SLP stated that Argentinian SLP was more cheaply priced than domestic SLP, five of eight responding purchasers stated that German SLP was more cheaply priced than domestic SLP, with the other three indicating that German SLP was priced the same or higher than domestic SLP (the Court's review of the questionnaire responses counts only seven responding purchasers on this question, with five responding that German SLP was cheaper than domestic, one indicating that German SLP cost the same as domestic, and one indicating that it cost more).  See id.; see also Responses to Purchasers' Questionnaire, Certain Seamless Carbon and Alloy Steel Standard, Line, and

As with likely volume, the Court cannot find that the evidence on the record supports ITC's finding that the likely price effects support a finding of likely continuation or recurrence of material injury.

With regard to the first subfactor, underselling, the ITC relies on the answers to a particular question in its purchasers' questionnaire. Commission's Views, CR List 2, Doc. No. 78 at 27-28; see also Staff Report, CR List 2, Doc. No. 76 at Table II-1; see, e.g., Company X Purchasers Questionnaire, CR List 2, Doc. No. 111 at Question III-23 (Feb. 12, 2001). In this question, the ITC asked purchasers of SLP to list, in order of importance, the three most important factors in deciding from which supplier to purchase SLP. See, e.g., Company X Purchasers Questionnaire, CR List 2, Doc. No. 111 at Question III-23 (Feb. 12, 2001). The ITC provided SLP purchasers with a list of example factors, including "current availability, extension of credit, prearranged contracts, price, quality of product, range of supplier's product line, traditional supplier, etc." Id. Out of the nineteen purchasers responding to the question, six rated price as the number one factor, six rated price as the number two factor, five rated price as the number three factor, and two did not rate price as one of the top three

---

Pressure Pipe from Argentina, Brazil, Germany, and Italy, CR List 2, Doc. Nos. 114, 117, 118, 123, 126-129 (not including 127A) at Question IV-6.

factors in making purchasing decisions.[23]  See Staff Report, C.R.
List 2, Doc. No 76 at Table II-1.  Though this evidence on its own,
along with evidence showing that subject merchandise significantly
undersold the domestic like product during the period covered by
the original investigation and that subject country prices for SLP
are lower than domestic SLP prices, might be enough to support the
ITC's determination that significant underselling would be likely
to occur, it is not the only evidence on the record.

The ITC asked purchasers of SLP another question, in which
purchasers were invited to rank fourteen purchasing factors as
either very important, somewhat important, or not important.  See,
e.g., Company X Purchasers Questionnaire, CR List 2, Doc. No. 111
at Question IV-10 (Feb. 12, 2001).[24]  The ITC then took note of how
many purchasers noted each factor as "very important."  Five
factors were rated as "very important" more often than price.  See

---

[23]Eight purchasers listed quality as the number one factor,
three listed it as the number two factor, and four listed it as
the number three factor.  See Staff Report, CR List 2, Doc. No.
76 at Table II-1.  Availability was listed as the number one
factors by two purchasers, as the number two factor by six
purchasers, and as the number three factor by one.  Id.  Other
factors, including "loyalty," "service," "competitive advantage,"
"delivery," and "market acceptability" were ranked as the number
one factor by three purchasers, as the number two factor by five
purchasers, and as the number three factor by nine purchasers.
Id.

[24]Sixteen purchasers responded to this particular question.
See Responses to Purchasers' Questionnaire, Certain Seamless
Carbon and Alloy Steel Standard, Line, and Pressure Pipe from
Argentina, Brazil, Germany, and Italy, CR List 2, Doc. Nos. 113-
115, 117, 118, 121-30 (including 127A).

Staff Report, CR List 2, Doc. No. 76 at Page II-13 and Table II-2. Of the five factors rated more important than price – product quality, product consistency, reliability of supply, delivery time, and availability - SLP purchasers indicated that the domestic product was superior to foreign SLP on delivery time and availability, as good or better on reliability of supply, and generally comparable on product consistency and quality. See Staff Report, CR List 2, Doc. No. 76 at Table II-7.

This second survey appears to cloud what might have been a clear picture of price importance; to wit, it renders unclear what is meant by "price" in the first survey. For instance, the five factors rated more highly than price, and as to which domestic SLP is superior or comparable, could affect prices, inasmuch as long wait times, inefficient delivery systems, and batches of poorly made product add to the cost of doing business. That is to say, even if initial prices for foreign SLP are lower than prices for domestic SLP, the low initial price may be offset by domestic producers' superior ability to deliver merchandise quickly, on time, over a long period of time, with relative consistency. The ITC did not discuss the effects of the second survey or the evidence that domestic SLP was considered superior or comparable to foreign SLP on five factors more commonly rated as very important than price, and provides no analysis of how or whether domestic SLP's superiority on certain factors makes it a "better bang for

the buck" than ostensibly lower-cost foreign SLP.[25]  While the Court

will defer to the ITC's reasonable interpretation of the evidence,

here the ITC offers no interpretation at all of the conflicting

evidence in the record.

The Court therefore remands the ITC's finding on likely price

effects for re-evaluation in light of its remand findings on

volume, for further consideration of the meaning and importance of

the second survey which the ITC conducted of producers and which

found five factors more important than price in SLP purchasing

decisions, and on which domestic SLP was rated as superior or

generally comparable by respondent purchasers, and for

clarification of its finding on price suppression and depression.


     iii.   <u>ITC's Findings on the Likely Impact of
Imports Are Not Supported By Substantial
Evidence</u>


Inasmuch as the ITC's findings as to the likely impact of

subject imports are based on its likely volume and likely price

effects findings, they must be remanded for further consideration

in light of the remand determinations on volume and price effects.

However, there is also an independent reason to remand ITC's impact

finding: its failure to properly account for or explain evidence

that suggests that the domestic industry would not be vulnerable to

---

[25]<u>Cf.</u> <u>supra</u> note 4.

injury even were the order revoked.

The ITC found that the domestic SLP industry's financial condition improved after the imposition of the antidumping orders in 1995, but substantial losses were sustained in 1999. See Commission's Views, CR List 2, Doc. No. 78 at 28-29.[26] The industry recovered somewhat in 2000. Id. at 29. However, between 1995 and 2000, the domestic industry's U.S. shipments, capacity to produce, capacity utilization, and actual production all declined. Id.

At the same time, the record appears to show that apparent U.S. consumption of SLP jumped drastically in 2000 and that industry prognostications indicate that the market will continue to grow. See Commission's Views, CR List 2, Doc. No. 78 at 29 n.180. Respondent domestic SLP firms indicated that they were commissioning new operations, and that operating margins were increasing despite parallel increases in raw material costs. Moreover, antidumping orders were placed on SLP imports from the Czech Republic, Japan, Romania, and South Africa. Id.

The ITC discounts these developments by noting that it did not find that they rebutted a finding that the industry was vulnerable

―――――――――――――――――――

[26]The Court notes that 1999 appears to have been a bad year for seamless pipe manufacturers globally. Subject producers' actual production of seamless pipe and capacity utilization slumped in 1999, only to recover markedly in 2000. See Staff Report, CR List 2, Doc. No. 76 at Tables IV-4, IV-6, and IV-8. Total shipments were also smaller than in previous years, although for the Brazilian producer, shipments in 1999 were slightly higher than in 1998, albeit far below shipments in 1997. See Staff Report, CR List 2, Doc. No. 76 at Tables IV-3, IV-5, and IV-7.

to material injury. <u>See</u> Commission's Views, CR List 2, Doc. No. 78 at 29 n.179. Specifically, the ITC mentions operating losses sustained in 1999, and the bankruptcy of one domestic producer as signs that the domestic industry is still vulnerable. The ITC's discussion, however, is scanty. Without some further indication of how and why improving industry indicators affect the equation, the Court is unable to review ITC's determination.[27]

The Court therefore remands the ITC's finding as to the likely impact of subject imports in the event of revocation for further consideration in light of the remand determinations with regard to likely volume and likely price effects, and for further discussion and explanation of why the ITC found that the SLP industry's newfound strength did not suffice to defeat a finding of likelihood of material injury.

## CONCLUSION

The Court remands this sunset review to the ITC for clarification regarding the standard of "likeliness" employed, and, if an improper standard was used, reconsideration in light of the proper standard. Moreover, the Court finds that while, given the

---

[27]Three of the six Commissioners apparently found the indications of growing industry strength so persuasive that they determined that the domestic industry was not vulnerable to material injury in the event of revocation. <u>See</u> Commission's Views, CR List 2, Doc. No. 78 at 29 n.180. This indicates that not only is there conflicting evidence on the record, but that it has some weight.

proper standard of review, ITC's determination as to cumulation of subject imports is supported by substantial evidence, its determination that material injury is likely to reoccur in the event of revocation is neither in accordance with law nor supported by substantial evidence. The ITC failed to properly interpret the requirements of the "product-shifting" subfactor with regard to its volume finding. Moreover, each of the three factors upon which the ITC based its overall material injury finding is unsupported either because of deficiencies in the record evidence, or because ITC failed to explain how it arrived at its conclusions. On remand, the Court directs the ITC to identify whether it is economically feasible for subject producers to product-shift from other products to SLP for the U.S. market, to identify the weight it gives to subject producers' international corporate contacts and such contacts' effects on the volume calculus, to further discuss and explain the effects of its two purchasers' questionnaires on the importance of price in purchasing decisions, to clarify its position with regard to price suppression and depression, and to further discuss and explain why increasingly positive market indicators do not defeat a finding of vulnerability to material injury.

Commerce shall have until January 24, 2005 to submit its remand determination. The parties shall have until February 8, 2005 to submit comments on the remand determination. Rebuttal comments shall be submitted by February 22, 2005.

It is so ordered.


                                       /s/Donald C. Pogue
                                         Donald C. Pogue
                                             Judge


Dated:    October 27, 2004
          New York, New York