**Slip Op. 05-64**

**United States Court of International Trade**

<table>
<tr><td>

SIDERCA, S.A.I.C.,

          Plaintiff,

      v.

UNITED STATES,

          Defendant,

          and

UNITED STATES STEEL CORP.,

   Defendant-Intervenor.

</td><td>

Before: Pogue, Judge

Court No. 01-00603

</td></tr>
</table>

[Plaintiff's motion for judgment on the agency record is denied. The Court sustains the International Trade Commission's sunset review determination.]

Decided: June 9, 2005

White & Case, LLP (David P. Houlihan, Gregory J. Spak, Richard J. Burke, Lyle B. Vander Schaaf, Joanna M. Ritcey-Donohue) for Plaintiff.

James M. Lyons, Acting General Counsel, Peter L. Sultan, Attorney Advisor, United States International Trade Commission, for Defendant.

Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, James C. Hecht, Stephen P. Vaughn) for Defendant-Intervenor.

**OPINION**

**Pogue, Judge:** Plaintiff, Siderca S.A.I.C. ("Siderca"), challenges the remand determination of Defendant, the U.S. International Trade Commission ("the ITC"), in the sunset review of

antidumping orders on certain standard, line, and pressure pipe ("SLP") from Argentina, Brazil, Germany, and Italy.  Plaintiff alleges that aspects of the ITC's determination are unsupported by law or substantial record evidence.


**BACKGROUND**

In August of 1995, pursuant to the ITC's finding that U.S. producers of SLP were being materially injured by competition from dumped imports, the United States Department of Commerce imposed antidumping orders on SLP from Argentina, Brazil, Germany, and Italy. See Certain Small Diameter Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe from Argentina, 60 Fed. Reg. 39,708 (Dep't Commerce Aug. 3, 1995) (notice of antidumping duty order), Certain Small Diameter Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe from Brazil, 60 Fed. Reg. 39,707 (Dep't Commerce Aug 3, 1995) (notice of antidumping duty order and amended final determination), Certain Small Diameter Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe from Germany, 60 Fed. Reg. 39,704 (Dep't Commerce Aug. 3, 1995) (notice of antidumping duty order and amended final determination), Certain Small Diameter Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe from Italy, 60 Fed. Reg. 39,705 (Dep't Commerce Aug. 3, 1995) (notice of antidumping duty order).  Five years later, pursuant to 19 U.S.C. § 1675(c) (2000), the ITC instituted a sunset

review to determine whether revocation of the antidumping orders would likely lead to the recurrence of material injury to U.S. SLP producers within a reasonably foreseeable period of time. See 19 U.S.C. § 1675a(a)(1)[1]; Seamless Pipe from Argentina, Brazil, Germany, and Italy, 65 Fed. Reg. 41,090 (ITC July 3, 2000) (institution of five-year reviews concerning the countervailing duty and antidumping duty orders on seamless pipe from Argentina, Brazil, Germany, and Italy). The ITC cumulated the volume and effect of imported SLP from three of the four reviewed countries; having so done, the ITC found that these cumulated imports would likely cause recurrence of material injury to U.S. SLP producers within a reasonably foreseeable time. See Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Argentina, Brazil, Germany and Italy, Investigations Nos. 701-TA-362 and 731-TA-707-710 (Review) (July 2001), CR List 2, Doc. 78 at 30 ("Commission's Views").

Plaintiff, an Argentine producer of SLP, challenged these determinations before the Court. The Court upheld the ITC's

_____

[1]Title 19 U.S.C. § 1675a(a)(1) states, in part:

(1) In general.
   In a [sunset review], the Commission shall determine whether revocation of an order, or termination of a suspended investigation, would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time. The Commission shall consider the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked or the suspended investigation is terminated.

cumulation determination, but remanded its finding that revocation of the order would likely cause recurrence of material injury within a reasonably foreseeable time.[2]  Specifically, the Court remanded the determination so that the agency could (1) explain how it understood and applied the statutory term "likely" in making its determination, (2) address whether certain aspects of its "likely volume" determination were in accordance with law and supported by substantial evidence, (3) address whether certain aspects of its "likely price effects" determination were supported by substantial evidence, (4) address record evidence suggesting that the domestic industry might not be vulnerable to injury upon revocation of the antidumping order on subject producers' SLP.  On remand, the ITC again found likely the recurrence of material injury to the domestic industry in the event of revocation of the antidumping order.  Plaintiff now challenges that remand determination.

## STANDARD OF REVIEW

The Court reviews the ITC's determinations in sunset reviews to ascertain whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); see also 19 U.S.C. § 1516a(a)(2)(B)(iii).

---

[2]Siderca, S.A.I.C. v. United States, 28 CIT __, 350 F. Supp. 2d 1223, 1243 (2004). Familiarity with this opinion is presumed.

**DISCUSSION**

Plaintiff challenges the ITC's determinations on all four issues upon which the Court predicated its remand order.  The Court will address the issues in turn.

1.  <u>The "Likely" Standard.</u>

In its earlier opinion, the Court found that the ITC's determination did not indicate fidelity to the plain meaning of the statutory term "likely."  That term is the fulcrum upon which most of the determinations that the agency is required to make in a sunset review turn. For example, the ITC must determine whether material injury is "likely" to continue or recur. <u>See</u> 19 U.S.C. § 1675a(a)(1).

Various opinions of the Court have held that the term "likely" should be interpreted to mean "probable," or, to put it another way, "more likely than not."  <u>See, e.g.</u>, <u>A.G. der Dillinger Huttenwerke v. United States</u>, 26 CIT 1091, 1101 n.14 (2002) (explaining that in a countervailing duty sunset review, to satisfy a "likely" standard, a thing must be shown to be "probable," or "more likely than not"); <u>Usinor Industeel, S.A. v United States</u>, 26 CIT 367, 474-75 (2002) ("<u>Usinor I</u>"),   <u>Usinor Industeel, S.A. v United States</u>, 26 CIT 1402, 1403-04 (2002), affirmed after remand at 112 Fed. Appx. 59 (Fed. Cir. 2004) (rejecting argument that "likely" means something between "possible" and "probable").  In

light of previous cases dealing with contemporaneous reviews finding that the ITC may have employed the wrong standard, contemporaneous statements by the ITC arguing for or advancing a "possible," rather than a "probable" standard, and the lack of discussion of the issue in the determination itself, the Court directed the agency on remand to indicate what standard it had actually used, and if the standard used was incorrect, to revisit its determinations accordingly.

In its remand determination, the ITC states "[i]n our original views in these reviews we applied a 'likely' standard that is consistent with how the Court has defined that term in [its opinion remanding the original views] as well as in prior opinions addressing this issue." Views of the Commission on Remand, CR List 2, Doc. No. 147R at 5 ("Remand Determ."). The Court will accept this statement as an assertion that the evidence amassed and cited by the agency is such as to meet or surpass the burden under the "probable" standard. Therefore, at this juncture, the only way in which the agency's statement can be measured is by the sum of record evidence that the agency provides as the rationale for its determinations here.

2. <u>The likely volume analysis.</u>

In evaluating whether material injury is likely to recur, the

ITC is statutorily required to evaluate three factors and to determine whether they support a finding that revocation would lead to material injury in a "reasonably foreseeable" period of time. See 19 U.S.C. § 1675a(a)(1). The first factor concerns the likely volume of subject imports in the event of revocation. This factor itself has four non-exclusive sub-factors: (1) any likely increase in the production capacity or existing unused production capacity in the exporting country; (2) existing inventories of the subject merchandise; or likely increases in inventories; (3) the existence of barriers to the importation of such merchandise into countries other than the United States; and (4) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products. See 19 U.S.C. § 1675a(a)(2). In its pre-remand determination, the ITC appears to have considered two additional subfactors, for a total of six subfactors: (5) the extent to which the exporting countries' SLP production was export-driven; and (6) the international business affiliations of the manufacturers in the exporting countries. See Commission's Views, CR List 2, Doc. No. 78 at 25-27. In its prior opinion, the Court found that the ITC's evidence on the six subfactors was "minimal at best," but particularly remanded the ITC's evaluation of the product-shifting subfactor and the international business affiliation subfactor, finding that the ITC appeared to rely

heavily on both, that the ITC's product-shifting analysis was not in accordance with law, and that its reliance on business affiliations was unsupported by substantial evidence. Siderca, S.A.I.C., 28 CIT at __, 350 F. Supp. 2d at 1238. The Court will address the ITC's remand discussion of the two subfactors in turn.

    i. Product-shifting.

The product-shifting subfactor directs the ITC to consider the potential for product-shifting "if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products." 19 U.S.C. § 1675a(a)(2)(D). In its pre-remand determination, the ITC found that the potential for product-shifting was such as to support a determination that the likely volume would be so great as to cause recurrence of material injury. The ITC rested this finding on the fact that subject producers reported that product-shifting was physically possible; i.e, it was possible to adjust machines being used to produce other products so as to produce SLP. See Commission's Views, CR List 2, Doc. No. 78 at 24. The Court found, however, that such physical possibility was only the prerequisite for a positive finding as to the product-shifting subfactor, and that the ITC must also find that such shifting would

make economic sense for the subject producers.[3]  The Court therefore remanded this issue to the ITC.  Siderca, S.A.I.C., 28 CIT at __, 350 F. Supp. 2d at 1237-38 (2004).    On remand, the ITC again attempts to show that the potential for product-shifting is great enough to support a finding that the likely price effects of revocation will be such as to cause material injury to recur. To this end, the ITC refers the Court to a series of tables representing the subject producers' overall capacity, production, and capacity utilization for the years of the POR.  Remand Determ., CR List 2, Doc. No. 147R at 9.   The tables reveal that each producer concentrated on a different part of the market: Argentina – small-diameter pipe, Brazil – large-diameter SLP, Germany – other large diameter pipe.  See Certain Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe from Argentina, Brazil, Germany, and Italy, Staff Report to the Commission on Investigations Nos. 701-TA-362 and 731-TA-707-710 (Review), CR List 2, Doc. No. 76 at Tables IV-4, IV-6, & IV-8 (May 24, 2001) ("Staff Report").  The

_____

[3]While the ITC provided evidence to support the notion that prices for SLP are generally higher in the U.S. than elsewhere, the Court found that this fact alone was not sufficient to support a finding that product-shifting was economically rational. Siderca, S.A.I.C., 28 CIT at __ n.16, 350 F. Supp. 2d at 1237 n.16 (CIT Oct. 27, 2004).  The Court noted that in response to an ITC query directly on point, the majority of the foreign producers indicated that they could not product-shift "in response to a relative price change" for SLP vis-a-vis other products because it was not economically feasible. See id. The ITC responds to this statement in its remand determination. See infra note 7.

data also indicate that overall capacity remained constant during the POR,[4] that capacity utilization was generally high, and that overall production remained fairly steady except for 1999, when total production fell drastically for all subject producers. Id. Finally, the data shows that the amount of each product manufactured by each producer – SLP, oil country tubular goods ("OCTG"), mechanical tubing, etc. – varied from year to year. Id.

The ITC's efforts to use this evidence to show past product-shifting require the Court to review the meaning of the term "product-shifting." Title 19 § U.S.C 1675a(a)(2)(D) directs the ITC to consider "the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products." While the Court's prior opinion in this case did not explicitly state an interpretation of the term "product-shifting" as it occurs in this provision, the Court's understanding has been that product-shifting cannot occur unless machinery or facilities dedicated to the production of a certain good are rededicated to the production of subject merchandise. This understanding is grounded in the idea that the term "product-shifting" is framed and defined by its context: because the provision references "facilities . . . currently being used to produce other products,"

---

[4]While Argentina and Brazil's overall capacity remained the same, Germany's overall production capacity declined slightly during the POR.

and "which can be used to produce the subject merchandise," "product-shifting" must refer to using these otherwise-occupied facilities to produce subject merchandise.

It is clear that while the ITC's proffered evidence of varying product-mix is not incompatible with changing the use of machinery so as to produce SLP, the evidence does not clearly show the occurrence or likely occurrence of rededication of facilities, rather than mere fluctuations in capacity utilization amongst already adapted facilities.  The ITC has not indicated what the subject producers' capacity to produce each of their products was each year; thus, it is impossible to know what capacity was "dedicated" to a given product only to be later reassigned.[5]  While

_____

[5]The ITC takes issue in its supplemental briefing with the Court's use of the word "dedicated" to describe machinery used to produce a particular product. The ITC points out that the statute requires only that the ITC look at actual use of machinery that could be used to produce subject-merchandise in producing other products; not at whether machinery is "formally devoted" to the production of non-subject merchandise.  ITC's Supp. Br. at 1-2. The Court appreciates the distinction that the ITC is attempting to make between actual use and "formal dedication" to a particular use, but, given the facts of this case, it is too nice a distinction.  A machine may be said to be dedicated to the production of a particular product while it is used to produce that product alone. It may be readjusted and thus, rededicated to production of a different product. Depending on the machinery and the products, this process may be a quick and simple one.  Here it is clear that such rededication is possible because the foreign producers at issue produce other products on the same machinery and equipment used to produce SLP. See Siderca S.A.I.C.'s Response to Foreign Producers'/Exporters' Questionnaire: Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Argentina, Attach. 2 to Letter from David P. Houlihan & Lyle B. Vander Schaaf, White & Case LLP, to Christopher Cassie, U.S. Int'l Trade Comm'n, Office of

capacity utilization levels for the subject producers are generally high, they are not so high that the fluctuations in product-mix presented here could not be explained by a simple decision to make more or less of a given product on machines already dedicated to those products.[6]  The rededication of machinery, it seems to the Court, would not be necessary to achieve the production figures documented by the ITC.  The fact that the ITC  believes that this evidence shows product-shifting occurred in the past leads the

_____

Investigations, Re: Certain Seamless Carbon and Alloy Steel Standard Line, and Pressure Pipe from Argentina et al., Inv. Nos. 701-TA-362 & 731-Ta-707-710 (Review), CR List 2, Doc. No. 79 at Question II-6 (Mar. 19, 2001); Vallourec & Mannesman Tubes SA's Response to Foreign Producers'/Exporters' Questionnaire: Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Germany, CR List 2, Doc. No. 82 at Question II-6 (Mar. 19, 2001) (Vallourec & Mannesman Tubes SA, although headquartered in France, produces SLP in Germany and Brazil, and exports SLP from those facilities).

[6]The ITC notes in its remand determination that the subject producers' method of reporting capacity was suspect, and appears to be based on sales or production, rather than available facilities. See Remand Determ., CR List 2, Doc. No. 147R at 11. The fact that Siderca calculated its capacity as based on its sales or production, rather than on the number of facilities dedicated to the production of each good, suggests that its production of other products was integrated with its SLP production. Moreover, it was reasonable for Commerce to rely on Siderca's own reporting, assuming that such reporting would present the Plaintiff's practices in the light most favorable to it. Finally, the ITC notes that high fixed costs in the SLP industry require both subject and domestic producers to keep their mills working at high levels. Id.  It would appear, then, that even if the subject producers' method of reporting capacity might be suspect, their capacity utilization must necessarily be high, as is reflected in the record compiled by the ITC. See Staff Report, CR List 2, Doc. No. 76 at Tables IV-4, IV-6, & IV-8.

Court to believe that the ITC's interpretation of product-shifting refers to nothing other than subject producers' ability to vary product mix, regardless of whether this varying mix relies on actual rededication of machinery, or whether it simply reflects varying capacity utilization on dedicated lines.

While it appears to the Court that the ITC is mistaken in this belief, it also appears to the Court that the agency nevertheless has provided sufficient evidence to show that rededication of machinery would be likely in this case.  In its prior opinion, the Court asked the ITC to show that product-shifting would be "potentially a rational economic option" for the subject producers in light of revocation of the antidumping order.  Siderca, S.A.I.C., 28 CIT at __, 350 F. Supp. 2d at 1238.  Accordingly, the ITC must show that if the U.S. market were attractive enough that subject producers would want to take advantage of it, a rational option for doing so would be to shift production away from less profitable lines and into SLP.

Thus, the necessary elements to this proof are (a) strong U.S. demand and high U.S. price such that the market is attractive (b) subject producers having shown themselves responsive to market pressures in the past, (c) subject producers' physical ability to rededicate machinery, (d) factors counseling that product-shifting away from less profitable products would be an attractive option for entering the U.S. market.  The Court finds that the ITC has

shown all of these factors.

First, the ITC established in its earlier determination that the price in the U.S. is high, and that there is some consensus that demand will remain strong for the foreseeable future. See Commission's Views, CR List 2, Doc. No. 78 at 24-25; Staff Report, CR List 2, Doc. No. 76 at Pages V-17 to V-18. Second, the ITC has directed the Court, on remand, to evidence showing that subject producers have varied their production in the past, ostensibly in response to market changes. Thus, subject producers have shown themselves willing and able to react to changing market conditions. See Remand Determ., CR List 2, Doc. No. 147R at 9; Staff Report, CR List 2, Doc. No. 76 at Tables IV-4, IV-6, & IV-8. Third, subject producers appear to be physically capable of rededication of machinery. While the majority of subject producers reported, in their questionnaire responses, that it would not be economically feasible for them to product-shift, See Siderca, S.A.I.C., 28 CIT at __ n.16, 350 F. Supp. 2d at 1237 n.16, none of them reported that they were not physically able to do so. As the ITC reasonably points out here, their responses should be taken to an extent as "self-serving."[7] See Remand Determ., CR List 2, Doc. No. 147R at

---

[7]In particular, the ITC reviews Plaintiff's response to the question of whether it could product-shift in response to relative price changes. See Remand Determ., CR List 2, Doc. No. 147R at 12. Plaintiff checked the box for "No," and then explained its position by stating that its business strategy, which sought to establish long-term contracts, offering a complete range of products to consumers, made it unlikely that it

Fourth, the ITC also determined that there is an antidumping order in place on OCTG, another high-priced product which subject producers make, and in which Plaintiff specializes. The ITC therefore determined that because of the antidumping order on OCTG, there would be an extra incentive to transfer production away from OCTG toward SLP in order to take advantage of the newly opened market for the latter good. See Commission's Views, CR List 2, Doc. No. 78 at 25 n.151.[8] Moreover, on remand, in its discussion of

_____

would be able to shift production in response to the opening of the U.S. market. See Siderca S.A.I.C.'s Response to Foreign Producers'/Exporters' Questionnaire: Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Argentina, Attach. 2 to Letter from David P. Houlihan & Lyle B. Vander Schaaf, White & Case LLP, to Christopher Cassie, U.S. Int'l Trade Comm'n, Office of Investigations, Re: Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Argentina et al., Inv. Nos. 701-TA-362 & 731-TA-707-710 (Review), CR List 2, Doc. No. 79 at Question II-9 (Mar. 19, 2001). The ITC notes, however, that as it found, and the Court recognized, a significant portion of Plaintiff's sales of all goods are not bound to any contracts. See Remand Determ., CR List 2, Doc. No. 147R at 12; Siderca, S.A.I.C., 28 CIT at __ n.14, 350 F. Supp. 2d at 1235 n.14.

[8]In its prior opinion in this case, the Court noted that while the ITC claimed that Plaintiff would have a special incentive for switching production over to SLP, as there is a U.S. antidumping order in place on Argentine OCTG, it failed to indicate whether the amount of SLP that would likely supplant OCTG would be significant. See Siderca, S.A.I.C., 28 CIT at __ n.18, 350 F. Supp. 2d at 1238 n.18. However, it appears to the Court that the agency has remedied this deficiency on remand. First, by demonstrating on remand that Plaintiff is responsive to changing market conditions, the agency has indicated that there is more than a mere physical possibility of product-shifting. Second, by pointing to the relative importance of OCTG to Siderca's business, the agency furnishes a rationale for product-shifting given the current order on OCTG. See Remand Determ. at 9 n.36. Because its capacity utilization for all products is

subject producers' past behaviors, the ITC directs the Court to charts showing that capacity utilization is generally high among subject producers. See Remand Determ., CR List 2, Doc. No. 147R at 9; Staff Report, CR List 2, Doc. No. 76 at Tables IV-4, IV-6, & IV-8. Accordingly, it would appear that the ITC has demonstrated that upon revocation of the orders, the U.S. market would be an attractive one: given high capacity utilization rates, ability to rededicate facilities, and the inability to import other types of merchandise without facing dumping duties, product-shifting away from those other types of merchandise and toward SLP is at least "potentially a rational economic option" for subject producers.

It is true that the agency does not engage in any analysis so concise as that above. However, the agency provides all the necessary elements. While the determination is not one of "ideal clarity," the agency's path may still be reasonably discerned, Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974), and sufficient evidence is provided to show what the Court demanded previously – that product-shifting is at least potentially economically rational – if not, as the agency tried to demonstrate, that such shifting has occurred in the past. Thus, the Court here affirms the agency's determination regarding product-

---

high and because OCTG would be subject to a dumping order, were Siderca to decide to make the attempt to import large quantities of SLP to the United States, one of the more obvious ways to accomplish this goal without sacrificing extant SLP production would be to increase production through product-shifting.

shifting.

    ii. <u>Transnational corporate affiliations.</u>

In its prior opinion, the Court found that the ITC gave weight in its analysis of the likely volume of imports to the finding that the subject producers' transnational corporate affiliations were such as to "enhanc[e] their ability to supply seamless pipe customers with operations in the United States and abroad through flexible supply arrangements, including global contracts." <u>See</u> <u>Siderca, S.A.I.C.</u>, 28 CIT at __, 350 F. Supp. 2d at 1238 (quoting Commission's Views, CR List 2, Doc. No. 78 at 26-27). The ITC supported its reliance on the subject producers' transnational corporate affiliations with a citation to the Staff Report, which in turn cited mixed responses on the question of whether there is "an increasing trend on the part of some end users toward using global contracts." Staff Report, CR List 2, Doc. No. 76 at Page V-7. The Court held that this citation did not provide substantial evidence to support the position that the corporate affiliations would allow for a greater volume of subject merchandise to enter the U.S. market, and therefore remanded the issue for clarification. <u>Siderca, S.A.I.C.</u>, 28 CIT at __, 350 F. Supp. 2d at 1238-39.

On remand, the ITC states that each subject producer is affiliated with a larger transnational group, and that these

affiliations came into existence after the imposition of the antidumping order on SLP in 1995.  Remand Determ., CR List 2, Doc. No. 147R at 13-14.  The ITC also cites the testimony of several domestic producers that, as part of these transnational groups, the subject producers have "the means and distribution networks in place to start shipping immediately," and that because the transnational groups are already selling other products in the U.S., there would be no lag time upon the revocation of the order during which subject producers would need to slowly build up networks and customer contracts.  Id.  Finally, the ITC notes that after the order on SLP went into effect, one of the transnational groups began shipping SLP into the U.S. from France, which is not covered by the order, rather than from Brazil or Germany.  Id.

These additional citations are sufficient to allow the Court to find that the agency has shown a rational basis "between the facts found and the choices made." Burlington Truck Lines Co. v. United States, 371 U.S. 156, 168 (1962).  From the testimony cited by the ITC on remand, it now becomes apparent that the ITC means to show that, were the orders lifted, the subject producers could use the distribution networks, marketing expertise, and customer contacts of their corporate affiliates already in the United States to enable their re-entry into the U.S. market at an accelerated pace. Prior to remand, this was not made clear; while the ITC stated that global corporate affiliations were "such" as to

support its likely volume analysis, it made no effort to explain how. The ITC has rectified this problem in its remand determination.

Moreover, Plaintiff has not pointed to any contrary record evidence on this point. Rather, Plaintiff limits its arguments to the claim that, to the extent subject producers' global corporate affiliations indicate that some of these transnational groups have been importing subject merchandise during the POR from non-subject country producers, it is unlikely that the lifting of the orders would create a new influx of imports. See Siderca's Comments on ITC's Views of the Commission on Remand Pursuant to Slip Op. 04-133 at 18 ("Pl.'s Remand Comments"). Plaintiff's argument goes not to whether such affiliations could mitigate barriers to entry, but to whether it would be rational for subject producers' transnational affiliates to encourage further shipments into the U.S. However, the ITC appears to have considered the subject producers' transnational affiliations simply as a matter of whether, to the extent that further shipments would occur, barriers to entry (such as establishing sales offices, advertising, hiring, etc.) would be mitigated for the subject producers because of their extant relations with companies already present in the United States. Finally, Plaintiff's "rationality" argument ignores the fact that an increase in imports from the subject producers could be beneficial to the global firms of which subject producers form a

part.  The price of SLP would be driven down, and the global firms
would be in a position to supply the market with extra SLP at the
new, competitive price, whereas it appears that domestic producers
would be hard-pressed to do so.

Accordingly, the Court holds that the ITC's remand discussion
of global corporate contacts and the record evidence upon which it
is based support the agency's overall volume finding.


    3. The likely price-effects analysis.


The ITC is statutorily required to consider two subfactors in
evaluating the likely price effects.  These are (1) whether there
is likely to be significant price underselling by the subject
imports as compared with the domestic like product, and (2) whether
the subject imports are likely to enter the United States at prices
that would have a significant depressing or suppressing effect on
the price of domestic like products.  See 19 U.S.C. § 1675a(a)(3).
In its prior opinion, the Court remanded the ITC's price-effects
analysis so that the agency might reconsider both factors in light
of the remand analysis of likely volume, and because both factors
were independently unsupported by substantial evidence.  Siderca,
S.A.I.C., 28 CIT at __, 350 F. Supp. 2d at 1242.  The Court will
now consider the ITC's remand analysis of those two subfactors, in
turn.

    i. Likely underselling.

    In its determination prior to remand, the ITC based its analysis of likely underselling on its findings that (1) subject merchandise had outsold domestic merchandise prior to the imposition of the antidumping order, and (2) that questionnaire responses indicated that price was a very important factor in purchasing decisions in the U.S. market. See Commission's Views, CR List 2, Doc. No. 78 at 27-28. The Court found no problem with the first finding, but remanded on the finding that the questionnaire responses supported a view that price was an important factor in purchasing. Siderca, S.A.I.C., 28 CIT at __, 350 F. Supp. 2d at 1242.

    In making this finding, the ITC relied on the answers to a particular question in its purchasers' questionnaire. See Commission's Views, CR List 2, Doc. No. 78 at 27-28. ; see also Staff Report, CR List 2, Doc. No. 76 at Table II-1. In this question, the ITC asked purchasers of SLP to list, in order of importance, the three most important factors affecting the choice of a supplier of SLP. See, e.g., Company X Purchasers Questionnaire, CR List 2, Doc. No. 111 at Question III-23 (Feb. 12, 2001). The ITC provided SLP purchasers with a list of example factors, including "current availability, extension of credit, prearranged contracts, price, quality of product, range of

supplier's product line, traditional supplier, etc." Id. Out of the nineteen purchasers responding to the question, six rated price as the number one factor, six rated price as the number two factor, five rated price as the number three factor, and two did not rate price as one of the top three factors in making purchasing decisions. See Staff Report, C.R. List 2, Doc. No 76 at Table II-1.

The ITC also asked purchasers of SLP another question, in which purchasers were invited to rank fourteen purchasing factors as either very important, somewhat important, or not important. See, e.g., Company X Purchasers Questionnaire, CR List 2, Doc. No. 111 at Question IV-10 (Feb. 12, 2001). The ITC then took note of how many purchasers noted each factor as "very important." Five factors were rated as "very important" more often than price. See Staff Report, CR List 2, Doc. No. 76 at Page II-13 and Table II-2. Of the five factors rated more important than price – product quality, product consistency, reliability of supply, delivery time, and availability - SLP purchasers indicated that the domestic product was superior to foreign SLP on delivery time and availability, as good or better on reliability of supply, and generally comparable on product consistency and quality. See Staff Report, CR List 2, Doc. No. 76 at Table II-7.

The Court found that the ITC's determination did not account for the fact that while the first survey appeared to show that

price was an important factor in purchasing, the answers to the second survey appeared to show that price was less important than a variety of other factors upon which the domestic product was rated comparable or superior. It therefore remanded the issue to the ITC for further clarification. Siderca, S.A.I.C., 28 CIT at __, 350 F. Supp. 2d at 1242.

In its remand determination, the ITC acknowledges that purchaser responses to the second survey indicated that five factors had a higher average "importance rating" than price. Remand Determ., CR List 2, Doc. No. 147R at 19. However, on the two factors with the highest average "importance rating" – product consistency and product quality – both domestic and foreign product were rated by producers as comparable. Id. This is hardly surprising, as both must meet the ASTM standards for SLP in order to be acceptable in the U.S. market. Id. With respect to the factor with the third highest "importance rating" – reliability of supply – only six out of thirteen producers indicated that the domestic product was superior. Id. at 20. Thus, the domestic product and subject merchandise can be considered to be comparable or equal on these three factors.

With respect to the two remaining factors that were considered more important than price – availability and delivery time – the domestic product was rated as superior to subject merchandise. Id. Plaintiff appears to have waived any argument that domestic product

enjoys a premium because of this superiority – at least no record evidence appears to have been proffered to support the idea. Moreover, The ITC found that the domestic product was generally ranked as inferior to subject merchandise on the issue of price. Id.    Finally, the ITC found that, of the six purchasers who ranked "price" as only "somewhat important," rather than "very important," in their responses to the second survey, all six ranked price as one of the top three factors in making purchasing decisions in response to the ITC's first survey. Remand Determ., CR List 2, Doc. No. 147R at 20 n.72. The only purchaser to rank price as "not important" during the second survey ranked price among its top three purchasing decision factors in responding to the first survey. Id.

The Court finds that this information cures the deficiencies of the ITC's prior determination. The ITC has now squarely confronted the apparent differences between the two surveys and has indicated that, even to the extent given respondents' answers resulted in some factors being given more weight than price in the tabulation of the results of the second survey, the first survey appears to more clearly indicate the real importance of price to the purchasers. In tandem with the ITC's earlier finding that the subject imports outsold domestic product prior to the imposition of

the orders,[9] Remand Determ., CR List 2, Doc. No. 147R at 21-22, the Court holds that the ITC's underselling analysis appears sufficient to support a finding of adverse price-effects in the event of revocation.

    ii. Price suppression and depression.

    In its discussion of the second subfactor, the ITC notes that the original investigation found significant "price depressing and suppressing effects." See Commission's Views, CR List 2, Doc. No. 78 at 27. The ITC then notes that given the likely volume of subject imports, the lower prices for foreign SLP reported by purchasers, and a record of consistent underselling in the original investigation, the revocation of the antidumping orders will lead to exports with likely significant price depressing and suppressing effects. See id. at 28.

    In its prior opinion, the Court found that this finding –that both price depression and suppression would likely occur – was insufficiently explained. Siderca, S.A.I.C., 28 CIT at __, n.20, 350 F. Supp. 2d at 1239, n.20.

    On remand, the ITC explains that when it stated that it was

_____

    [9]The ITC also notes that after the imposition of the orders, purchasers switched away from subject merchandise toward non-subject imports. See Remand Determ., CR List 2, Doc. No. 147R at 21; Staff Report at IV-1 n. 1. Presumably, these non-subject imports were more cheaply priced than domestic product, as an antidumping order was placed on many of the countries from which they emanated in 1999.

likely that both price suppression and depression would likely occur in the result of revocation of the orders, it did not mean to ambiguously imply that both would happen, across the industry, simultaneously. Rather, it is likely that both would happen, not across the board and simultaneously, but to various companies as they individually varied their business strategies in response to the revocation of the order. Remand Determ., CR List 2, Doc. No. 147R at 22-23. This is to say, it is likely that, given the likelihood of significant underselling by subject imports, some domestic producers would lower their prices, and some would refrain from raising their prices in the future. Id. Various companies might employ each strategy in turn. Id. If demand for SLP in the U.S. market remains strong, price suppression would be more likely; if demand is weak, depression would more likely occur. Id.

The ITC notes that, in its determination in the original investigation of SLP from subject producers' countries, it found that there had been varying reactions of suppression and depression in response to competition from subject producers' imports. Id. at 23. The ITC argues that this fact supports its determination that in the event that the orders are lifted, there will be variable price effects across the market. The ITC states that it believes that, given that the U.S. price for SLP was increasing toward the end of the POR, suppression would be the most likely first response to the revocation of the orders, followed by depression as imports

become established in the market.  Id. at 24.

     The Court finds that this explanation is sufficient to meet the ITC's burden to show a "rational basis" between the facts found and the choices made.  The remand determination makes clear the ITC's position on the question of suppression and depression.

          4. Likely Impact of Subject Imports.

          The ITC's findings on the likely impact of subject imports necessarily rest on its findings that the likely volume of imports is such as will have an impact, and the likely price effects such as to disrupt the U.S. industry. The Court in its prior opinion also specifically asked the ITC to address whether the ITC's likely impact analysis properly accounted for apparent indicators of "new-found strength" in the U.S. SLP industry.  Siderca, S.A.I.C.,  28 CIT at __, 350 F. Supp. 2d at 1243.

     Pursuant to statute, in addition to evaluating the likely volume and price effects of subject imports in the event of revocation, the ITC must also examine the likely impact of such imports on domestic producers.  See 19 U.S.C. § 1675a(a)(4). In its initial, pre-remand determination, the ITC found that the domestic SLP industry's financial condition improved after the imposition of the antidumping orders in 1995, but substantial losses were sustained in 1999.  See Commission's Views, CR List 2, Doc. No. 78

at 28-29.[10]  The industry recovered somewhat in 2000.  Id. at 29.

However, between 1995 and 2000, the domestic industry's U.S.

shipments, capacity to produce, capacity utilization, and actual

production all declined.  Id.

At the same time, the Court found that the record appeared to

show that apparent U.S. consumption of SLP increased significantly

in 2000 and that industry prognostications indicate that the market

will continue to grow.  See Commission's Views, CR List 2, Doc. No.

78 at 29 n.180.  Respondent domestic SLP firms indicated that they

were commissioning new operations, and that operating margins were

increasing despite parallel increases in raw material costs.

Moreover, antidumping orders were placed on SLP imports from the

Czech Republic, Japan, Romania, and South Africa.  Id.

While the ITC's determination made some attempt to explain

away these developments, its analysis was not sufficient to provide

a reasonable basis for discounting them. Therefore, the Court

remanded the likely impact analysis to the agency for a fuller

discussion of why improving industry indicators did not affect the

_____

[10]The Court notes that 1999 appears to have been a bad year
for seamless pipe manufacturers globally.  Subject producers'
actual production of seamless pipe and capacity utilization
slumped in 1999, only to recover markedly in 2000. See Staff
Report, CR List 2, Doc. No. 76 at Tables IV-4, IV-6, and IV-8.
Total shipments were also smaller than in previous years,
although for the Brazilian producer, shipments in 1999 were
slightly higher than in 1998, albeit far below shipments in 1997.
See Staff Report, CR List 2, Doc. No. 76 at Tables IV-3, IV-5,
and IV-7.

ITC's determination.  See Siderca, S.A.I.C.,  28 CIT at __, 350 F. Supp. 2d at 1243.

On remand, the ITC explains that while the industry's progress in the year 2000 was very good, it was only so as compared to its state in 1999, a year in which SLP producers around the world suffered.  Remand Determ., CR List 2, Doc. No. 147R at 27.  While compared to 1999, the 2000 figures were excellent, they showed that the industry was in many respects even weaker than it had been in 1995, the year that the antidumping orders on SLP from subject producers went into effect.  Id.  For example, production levels, market share, domestic shipments, and net sales were all lower in 2000 than they had been in 1995 and industry's 2000 operating income was not sufficient to cover 1999's losses.  Id. Furthermore, U.S. SLP consumption in 2000 was barely higher than it had been in 1995, and prognostications for the future were mixed. Id. at 28.  Finally, the ITC notes that the imposition of dumping orders on SLP from countries other than subject producers during the POR is evidence that the domestic industry remained vulnerable to import competition during that time.  Id. at 29.

There is, of course, as Plaintiff argues, record evidence suggesting a sunnier picture for the industry.  Operating income in 2000 was the second highest yearly operating income since 1992. See Staff Report, C.R. List 2, Doc. No. 76 at Table I-1.  Certain indicators, such as end-of-year inventories, were very good.  Id.

Some indicators suggested that U.S. demand was likely to remain strong. <u>See</u> Pl.'s Remand Comments at 26. In point of fact, the record evidence for each view of the industry – as either vulnerable to material injury or strong enough to withstand import competition, even from possibly dumped imports – is strong enough that prior to the remand, the Commissioners split 3-3 on the issue. <u>See</u> Commission's Views, C.R. List 2, Doc. No. 78 at 29 n.180.

Such a split in the evidence, however, is not fatal to the ITC's determination.  It is well-established that there may be substantial evidence on an administrative record to support two inconsistent determinations. <u>Consolo v. Fed. Mar. Comm'n</u>, 383 U.S. 607, 620 (1966) (citation omitted).  Substantial evidence, after all, need only be"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938) (citations omitted).  Reasonable minds may differ.  The Court finds that the ITC's remand discussion of the likely impact of subject imports  adequately explains why the ITC found that the industry would be adversely impacted by the lifting of the orders, despite the existence of positive industry indicators.  Here, as opposed to its pre-remand determination, the ITC has squarely stated why it feels that those indicators belie the turbulent recent history of the domestic SLP producers, which faced major losses in 1999 and which were harmed by imports from non-market producers.  Moreover, even if Plaintiff is correct in

stating that demand for SLP is likely to remain strong, it is not at all certain that, given the industry's recent history, U.S. producers would be in a position to capture much of that demand if they were faced with competition from subject producers.

Accordingly, the Court holds that the ITC's analysis of the likely impact of subject imports is supported by substantial evidence.

**CONCLUSION**

The Court affirms the ITC's use of the term "likely" as applied throughout its remand determination. The Court likewise affirms the agency's findings on the likely volume, price effects, and impact of subject imports in the event of revocation of the antidumping orders on SLP from Argentina, Brazil, and Germany.

/s/ Donald C. Pogue
Donald C. Pogue
Judge

Dated:    June 9, 2005
          New York, New York